## HALE *v.* GENERAL BOX MANUFACTURING Co., et al.

No. 41001 February 16, 1959 108 So. 2d 844

302

H. C. Mike Watkins, Meridian, for appellant.

*Snow, Covington & Shows,* Meridian, for appellee.

KYLE, J.

This case is before us on appeal by E. J. Hale from a judgment of the Circuit Court of Lauderdale County, affirming orders of the attorney-referee and the Workmen's Compensation Commission awarding compensation to the appellant for temporary total disability and permanent partial disability resulting from an injury sustained by the appellant on December 3, 1951, while he was engaged in the performance of his duties as an employee of the General Box Manufacturing Company. This is the second time the case has been before us on appeal. See Hale v. General Box Manufacturing Co., 87 So. 2d 679.

The record shows that the appellant sustained his injury as the result of a fall from a stack of veneer to the concrete floor on December 3, 1951, while engaged in the performance of the duties of his employment. The employer's insurance carrier thereafter paid compensation to the appellant through December 18, 1952. On January

5, 1953, the carrier notified the claimant that it was suspending compensation payments as of December 19, 1952. A copy of that letter was filed with the Workmen's Compensation Commission on January 6, 1953, and on January 20, 1954, the carrier filed with the Commission its final report on Form B-31. On February 3, 1954, the appellant through his attorney, wrote a letter to the Commission advising that the carrier had not paid any compensation since December 19, 1952, and requesting a hearing by the Commission to determine whether the appellant was entitled to additional compensation. No hearing was granted or refused, and the matter lay dormant until February 2, 1955, when the appellant filed with the Commission a motion for the appointment of Dr. J. S. Hickman, a physician of the appellant's own choice, to examine him for the purpose of determining the extent of his disability. The attorney-referee overruled the appellant's motion; and on March 4, 1955, the appellant filed a formal claim on the Commission's Form B-11 asking that the case be listed as a controverted matter and set for hearing to determine the extent of the claimant's permanent disability. A hearing was granted, and at the conclusion of the hearing the attorney-referee found that, since the claimant had not filed his Form B-11 application for a hearing within one year after receipt of the last payment of compensation, the Commission had lost jurisdiction of the cause under Section 21 of the Workmen's Compensation Act, as amended, (Section 6998-27, Code of 1942, Rec.); and the attorney-referee entered an order dismissing the claim. The order of the attorney-referee dismissing the claim was affirmed by a majority vote of the Commission; and the order of the Commission was affirmed by the circuit court. On June 4, 1956, this Court reversed the judgment of the circuit court and the order of the Commission and remanded the cause to the Commission for further proceedings upon the claimant's application

for a hearing to determine whether he was entitled to additional compensation.

New hearings on the appellant's claim for additional compensation were begun on October 30, 1956, pursuant to the mandate of this Court. It was agreed that the record of the proceedings on the former hearing, including the testimony of the witnesses who had testified during the former hearing, should constitute a part of the record on the second hearing. After several witnesses had testified, it was agreed that Dr. Charles L. Neill, a neuro-surgeon, of Jackson, Mississippi, should make further diagnostic studies of the claimant's condition, and the hearings were not concluded until July 9, 1957. The claimant and his wife, two laymen and two doctors testified for the claimant. Three doctors and one of the plant supervisors of the box company testified for the employer and its insurance carrier.

The claimant testified during the hearing before the attorney-referee on February 22, 1955, that he was injured on December 3, 1951, when he fell from the top of a stack of veneer in the box company plant and landed on the concrete floor; that the stack of veneer was approximately 14 feet high; that he fell 9 feet and landed on another stack of veneer, and bounced off that stack onto the concrete floor, falling across a pile of trash and striking his head against the concrete. He got up and tried to walk, but his head and back were hurting him, and he had to lie down again. He was carried to Anderson's Infirmary and was examined by Dr. Paul H. Parker. He remained in the hospital several days and was treated by Dr. Parker for the injury to his back. He complained to Dr. Parker about his head hurting him, and Dr. Parker told him that he thought he would be all right when his back was straight. He went to see Dr. Parker several times after leaving the hospital and complained all the time about his head. Dr. Parker said to him, "When you make up your mind there is nothing

wrong with you, you will be able to go back to work''. Dr. Parker made no X-rays of his head. Hale stated that Dr. Parker finally sent him to Jackson to Dr. T. H. Blake. Dr. Blake examined him and made X-rays of his back, but did not look at his head. Dr. Blake decided that a surgical operation for the back injury was necessary, and the operation was performed in June 1952. Dr. Blake told him that it was to repair a ruptured disc. Hale stated that he made complaints of pain in his head and back while he was in the hospital after his fall, and that he made such complaints to every doctor who treated him thereafter; but none of the doctors who treated him ever examined his head or treated him for a head injury until Dr. Hickman made X-rays of his head in 1955. Hale stated that Dr. Charles L. Neill examined him in December 1952, but Dr. Neill never talked to him about his injury other than his back pain. Hale stated that he had suffered from head spells and blackouts since his injury, and that these seizures occurred at least once or twice a week, and that his right side appeared to be partially paralyzed. He had been unable to do any heavy work since the date of his injury, and his earnings had amounted to only $3 to $6 per week.

Hale testified on October 30, 1956, that he was in worse condition at that time than he was in at the time of the hearing in February 1955. His right leg would not function like his left leg functioned, and he continued to have seizures and blackouts. He had worked a little in his garden. The only other work that he was able to do was to sweep and mop the legion hall, for which he was paid $4 a week. He had put out circulars a few times for Western Auto Company, and had received $4 to $6 for that. Hale admitted on cross-examination that in April, 1953, he had applied to the box company for work and represented himself at that time as being able to work. Hale stated that he felt that he was able to work at that time, that his family was suffering and he was willing to

try to work, but they sent him to Dr. Parker, the company physician, and Dr. Parker examined him and said that he was not able to work.

Mrs. Ozela Hale, the claimant's wife, testified that the claimant had not been able to engage in his normal activities since he got hurt in 1951, and that his condition had grown steadily worse since that time; that he suffered blackouts, and when he had such attacks he would bite his tongue and jaws; that he tried to help her work in the garden, but, when he did that, he had to get down on his knees or sit on a stool, on account of his back and his leg. Charles Huston Swanner testified that he had known Hale for a period of approximately 20 years; that prior to his injury on December 3, 1951, Hale had walked like any other able bodied man, and did not complain of having anything wrong with him; that since his injury he had suffered from a stiff back and right leg, and when he tried to work he had to sit down on a stool or get down on his knees, and if he overexerted himself, he had blackouts; and that he had no job other than cleaning up at the American Legion hut. Frank A. Gossett's testimony was substantially the same as that of Swanner. Gossett stated that he had given Hale the job cleaning up the Legion dance hall, and for that service Hale was paid $2 per day. The hall was cleaned up once a week, and Hale sometimes put in two days in cleaning up the hall.

Dr. J. S. Hickman testified that he examined the claimant on March 2, 1955, and again on March 14, 1955, and that in his opinion Hale was suffering from innercranial injury to the brain, laryngeal and pharyngeal, partial motor paralysis and epileptic seizures. He attributed these conditions too the injury of December 3, 1951.

Dr. John G. Atwood testified that Hale was referred to him for an examination by the County Department of Public Welfare in February 1955, and that he examined Hale at that time. He found a generalized weakness, headaches, backaches and speech difficulty. The diag-

nosis indicated that Hale had a ruptured intervertebral disc syndrome in the lower back and a chronic brain syndrome. The diagnosis showed that Hale was not able to work. Hale came back to see him on July 11, 1956. The same general train of symptoms were noted at that time. Hale appeared to have lost strength since the examination made in February 1955, and complained of more continual headaches. Hale gave him a history at that time of the injury that he had received on December 3, 1951. Hale told him that he had fallen and had struck his head on concrete, which rendered him unconscious, and that he was later sent to an orthopedic surgeon in Jackson and underwent an operation for a herniated disc in June 1952. Dr. Atwood stated that Hale appeared to have had a type of seizures, which, according to Hale and his wife, had grown to be a major problem, seizures characterized as generalized convulsions, with biting of the tongue and unconsciousness, ''which is the history sounds exactly like a Jacksonian type of epilepsy from injury''. The doctor stated that Hale's symptoms indicated a chronic brain syndrome which was progressive, and by that he meant that Hale had sustained brain damage sufficient to make scar tissue. The doctor stated that, according to the history related to him, Hale had been struck hardest on the left side and back of the head, that Hale had apparently received a severe concussion at the time of his injury and was still suffering from the bad effects of the brain damage; and that convulsive seizures frequently follow brain damage. The doctor stated that he had not observed any such seizures during his examination of Hale; but Hale had a stammering speech difficulty, which was getting worse, and a very easily demonstrable paresthesia on the right side of the body; and Hale was almost immune from pain when stuck in the right arm and leg with a sharp needle.

Dr. Atwood admitted that the symptoms which he had described could have resulted from some congenital con-

dition. But in answer to a hypothetical question based upon the assumption that Hale had fallen and had struck his head against the concrete floor, as Hade had testified, and based upon his own findings as related above, the doctor stated that in his opinion the trauma which Hale suffered as a result of his fall was the proximate cause of the condition he found Hale in when he examined him. The doctor stated that in his opinion Hale was unable to work, and that it would be dangerous for him to be around any moving machinery. In answer to a question by the attorney-referee, the doctor stated that there was not anything that medicine could do for a man in Hale's condition. He was then asked, by what date, in his opinion, did Hale reach the maximum benefit of medical aid. His answer was: "Now there again I have to draw on the history. The appearance of the vague type of seizure at the time he was convalescing from the back operation seems to me to herald the onset of the brain situation."

Dr. Paul H. Parker was the first witness who was called to testify for the employer. Dr. Parker testified that Hale was referred to him on December 3, 1951. Hale stated to him at that time that he was up on a stack of new veneer, and that he fell, it might have been 8 feet, and that he hurt his back in the lumbosacral. Hale was admitted to Anderson's Infirmary and X-ray pictures were made. There was no evidence of any fracture or any other pathology of the bone. The diagnosis at that time was lumbosacral sprain. The doctor treated Hale until December 15, gave him diathermia treatment, and strapped his back and gave sedation. Hale made no complaint to him during that time about having hit his head or his head hurting him; he complained only about his back. The doctor examined him again on February 8, 1952. His complaint at that time was pain in his back. X-rays were made and no evidence of fractures or dislocations was noted. The doctor saw Hale again on March 12 and several times thereafter, and sometime during the

latter part of March the doctor referred Hale to Dr. T. H. Blake in Jackson. Dr. Parker stated that Hale had not made any complaint to him about his head, at least he had no record about any headaches. Dr. Parker admitted on cross-examination that he saw Hale at a hearing in May 1953, and that he did not deem it advisable for Hale to go back to work at that time.

Dr. Blake testified that he first saw Hale on March 31, 1952. Hale complained of back pains, and he thought that Hale was suffering from a protruded disc or back strain. On May 1, 1952, he made another examination which indicated strongly the existence of a ruptured disc. On May 13, 1952, a myelogram was done, and the presence of a ruptured disc was confirmed. A surgical operation on account of the ruptured disc was performed on June 20, 1952, and Hale was discharged from the hospital on June 28, 1952. Dr. Blake stated that he saw Hale from time to time until November 24, 1952, and that Hale continued to complain of pain in his back, and during the examination made in November Hale complained of pain on all tests, including the false test. In Dr. Blake's opinion Hale was able to resume light work on August 21, 1952, and after a ''break in'' period he would be able to resume his normal activity. Dr. Blake testified that Hale made no complaint to him of headaches, blackouts or seizures. But in November 1952 Dr. Blake requested neuro-surgical consultation, and made an appointment with Dr. Charles Neill for an examination of Hale on December 4, 1952.

Dr. Neill testified that he examined Hale on December 4, 1952, and that Hale told him at that time that he had slipped and fallen on his hands and stomach from a stack of veneer in the General Box plant on December 3, 1951, and had slipped again and fallen flat on his back. Hale told him that he had remained under the treatment of Dr. Parker for sometime thereafter, and was then sent to Dr. Blake, who found his trouble and operated on him, but

he continued to have low back pain across his sacrum. Dr. Neill stated that he found that Hale had a "sensory hypesthesie, or numbness to pin prick or pain, over a nonanatomical stocking glove distribution on the legs up to the upper thigh and arms up to the shoulders". Hale, at that time, did not mention his head striking the floor, and he did not mention blackouts or seizures. The doctor could find no evidence of sciatic back pain and no evidence to indicate that Hale could not go on and tend to his usual work.

Dr. Neill testified again on July 9, 1957, after he had completed his diagnostic studies of the claimant. The doctor testified at that time, that when he began his studies on December 18, 1956, the claimant stated to him that he began to have convulsions about 3 months after his injury and had continued to have convulsions thereafter; that during the hard seizures at night he chewed his tongue, but when the light seizures occurred during the daytime he could sometimes prevent them by bending over and putting his head between his knees. The doctor stated that these complaints represented considerable deterioration from Hale's status at the time of his first examination in 1952. The doctor stated, however, that he could not relate any head injury or injury to the brain too the accident which occurred on December 3, 1951; and if the claimant had suffered seizures or anything of that kind, they were just something that he had developed. Dr. Neill estimated the claimant's disability as a whole arising out of the alleged back injury, and the subsequent operation performed as a result of the back injury, his walking with a limp, etc., at 20%. He was also of the opinion that the claimant was able to do his usual work and needed no more treatments, and that the claimant had reached maximum medical recovery at the time he first saw him on December 4, 1952.

The attorney-referee found that the claimant was employed by the General Box Manufacturing Company at

the time of his injury on December 3, 1951, at an average weekly wage of $35; that on that date the claimant sustained an accidental injury which arose out of and in the course of his employment; that as a result of that injury the claimant was temporarily and totally disabled from December 3, 1951, to December 1, 1952, and that the claimant had reached maximum recovery on December 1, 1952; that the claimant had suffered no serious permanent disability as the result of the injury; and that his loss of wage earning capacity from the same employment or otherwise subsequent to December 1, 1952, was $6 per week. The attorney-referee therefore entered an order awarding compensation for permanent partial disability at the rate of $4 per week for the period beginning December 1, 1952, not to exceed the maximum benefits provided by the statute, and directing that the employer and its insurance carrier pay all medical expenses incurred on account of said injury. The findings and award made by the attorney-referee were affirmed by a majority of the full Commission on November 29, 1957. The third Commissioner filed a vigorous dissent. On appeal by the claimant to the circuit court that court entered judgment approving the award made by the Commission.

Three points are argued by the appellant's attorney as ground for reversal of the order of the Commission and the judgment of the lower court: (1) That the attorney-referee, the Commission and the circuit court erred as a matter of fact in fixing appellant's loss of earning capacity as a result of the injury at $6 per week; (2) that the attorney-referee, the Commission and the circuit court erred as a matter of law in disregarding the express provisions of Section 6(b) of the Mississippi Workmen's Compensation Act as amended (Section 6998-07, Code of 1942 rec.), providing for a minimum weekly payment of $10 under an award; and (3) that the attorney-referee, the Commission and the circuit court erred in their finding of fact that the appellant had suffered no serious permanent disability.

The appellees contend that the findings and order of the attorney-referee and the Commission are supported by substantial evidence and, therefore, should not be disturbed.

■■■ We have made a careful examination of the record in this case, and we find no substantial evidence in the record to support the findings of the attorney-referee and the Commission "that the claimant suffered no serious permanent disabilities as a result of the accident", or "that his loss of wage earning capacity in the same employment or otherwise subsequent to December 1, 1952, was $6 per week". It is true that Dr. Neill stated that he could not see how any disability resulting from a brain injury or epileptic seizures could be related to the accident which occurred on December 3, 1951, and that a twenty percent rating for the disability resulting from the "alleged back difficulty, his walking with a limp and straight leg raising and so forth" and "the fact that he had an operation", would be very generous. But it is clear that the estimate of Dr. Neill as to the claimant's physical disability was merely an estimate of disability in the medical or physical sense resulting from the back injury and the operation for the ruptured disc, and not an estimate of the loss of wage earning capacity. The question which the Commission had to determine in this case, after disability in the medical or physical sense had been shown, was the extent of the claimant's loss of wage earning capacity resulting from the injury. Section 6998-09(c) 21, Code of 1942 Rec.

"Disability", as that term is used in the Mississippi Workmen's Compensation Law, is defined in Section 6998-02, Code of 1942 Rec., as meaning "incapacity because of injury to earn the wages which the employee was receiving at the time of injury in the same or other employment."

Section 6998-09(c) 21, Code of 1942 Rec., provides that the compensation for permanent partial disability in a

case of this kind shall be "sixty-six and two-thirds per centum (66-2/3%) of the difference between his average weekly wages, subject to the maximum limitations as to weekly benefits as set up in this act, and his wage earning capacity thereafter in the same employment or otherwise, payable during the continuance of such partial disability * * *."

Larson, in his Workmen's Compensation Law, Vol. 2, par. 57.10, says:

"It has been stressed repeatedly that the distinctive feature of the compensation system, by contrast with tort liability, is that its awards (apart from medical benefits) are made, not for physical injury as such, but for 'disability' produced by such injury. The central problem, then, becomes that of analyzing the unique and rather complex legal concept which, by years of compensation legislation, decision and practice, has been built up around the term 'compensable disability'.

"The key to the understanding of this problem is the recognition, at the outset, that the disability concept is a blend of two ingredients, whose recurrence in different proportions give rise to most controversial disability questions: The first ingredient is disability in the medical or physical sense, as evidenced by obvious loss of members or by medical testimony that the claimant simply cannot make the necessary muscular movements and exertions; the second ingredient is *de facto* inability to earn wages, as evidenced by proof that claimant has not in fact earned anything."

 The Commission in a case of this kind properly gives great weight to medical evidence in determining incapacity, but the Commission is not conclusively bound by such evidence. As stated by the Virginia Court in the very recent case of Foust Coal Co. v. Messer, (1954) 195 Va. 762, 80 S. E. 2d 533, medical evidence is not the sole criterion. There have been and properly will continue to be cases where the medical evidence shows

only a percentage of disability when in truth and in fact the disability so found renders the claimant incapable of working and therefore incapable of earning wages. The loss of earning power as the result of an injury is not necessarily proportional to the bodily functional disability, and the proof of such loss is not limited to any special class of proof. The extent of the claimant's incapacity because of injury to earn the wages which he was receiving at the time of the injury must be ascertained from the evidence as a whole. Elliott v. Ross Carrier Co., 220 Miss. 86, 70 So. 2d 75; Modern Laundry, Inc., et al v. Williams, 224 Miss. 174, 79 So. 2d 829; Ebasco Services, Inc., et al v. Harris, 227 Miss. 85, 85 So. 2d 784; Foust Coal Co. v. Messer, supra.

In the case that we have here the testimony of the appellant and his wife and the two lay witnesses who testified for the appellant was all to the effect that the appellant was almost completely disabled from earning wages, and that disability had existed since the date of his injury. The appellant testified that his earnings had amounted to about $4 to $6 per week since his injury. While the appellant's earnings after the injury are not necessarily determinative of his earning capacity, they are of evidential value in establishing his earning capacity after the injury in the same employment or otherwise. Elliott v. Ross-Carrier Co., supra. Dr. Parker admitted on cross-examination that, when the appellant applied to the box company for reemployment in May, 1953, and was referred to him for an examination, he refused to advise the box company that the appellant was able to work, because the appellant told him at that time that he still had pains in his back. That was six months after the date fixed in the Commission's order as the date the appellant reached maximum recovery. Dr. Parker testified that he had treated the appellant only for his back injury, and that his record showed nothing about Hale's complaint of a head injury. Dr. Atwood testified that

Hale was unable to work when he examined him for the County Welfare Department in February 1955, and at the time he examined him in July 1956; and Dr. Atwood's testimony clearly indicates that, in his opinion, if the appellant suffered a head injury as a result of his fall, such head injury contributed to the development of the convulsive seizures which manifested themselves sometime thereafter. Dr. Neill, in a letter to the insurance carrier, dated March 1, 1957, said: "A severe shaking up injury caused the patient to develop this seizure tendency, and I would rate such disability in the neighborhood of forty percent permanent disability to him as a whole." And Dr. Neill reaffirmed that estimate in a letter to the insurance carrier dated May 1, 1957.

It is admitted in this case that the appellant's injury arose out of and in the course of his employment. The attorney-referee and the Commission also found that the appellant reached maximum recovery on December 1, 1952, and that he was entitled to permanent partial disability from and after that date. The fact that the appellant is not totally disabled, or, that he may be "physically capable of going out and getting to work", as Dr. Neill stated, does not affect his right to compensation based upon his loss of wage earning capacity resulting from the injury. Neither does the fact that the appellant's disability may have been aggravated by an onset of disease, as to the nature of which the medical experts have been unable to agree, affect the appellant's right to compensation for the loss of earning power resulting from the injury. "Where the requisite standards of proof have otherwise been met, inherent perplexities cannot be permitted to defeat an award." 100 C. J. S., p. 583, Workmen's Compensation, par. 547 (1).

The evidence in this case, in our opinion, clearly shows that the appellant has suffered as a direct result of his injury a loss of wage earning capacity of not less than 50% of total. Reasonably stable employment is not

usually available for an employee who has been disabled by a back injury from which he has not fully recovered, or who is crippled physically by a partial paralysis or a numbness or otherwise. Whether the appellant's overall loss of earning capacity is due solely to the injury resulting from the fall referred to in the record, or partly to the injury and partly to some other bodily infirmity, cannot be determined with certainty. But the greater portion of the loss in our opinion is chargeable to the injury. As stated by the New Jersey Court in Kolesnik v. Irvington Varnish & Insulator Co., (1938), 120 N. J. L. 48, 197 A. 727, considering the appellant's apparent good health and unimpaired capacity for work prior to the accident, in the light of subsequent developments, "it is inconceivable that the trauma was not a causative agent of the enlarged disability."

 ██ The employer and its insurance carrier have sought to attribute the appellant's disability, or the major part of it, to causes for which they are not legally responsible. But the courts have generally held in compensation cases that, "Where injury by accident arising out of and in the course of employment is shown, the burden is on the employer to prove his defense that present disability is due to some other intervening cause or pre-existing condition for which he is not responsible." 100 C. J. S., p. 490, Workmen's Compensation, par. 521a; and cases cited; Serignese v. Air Reduction Sales Co., (1947), 135 N. J. L. 317, 51 A. 2d 543; Ptak v. General Electric Co., (1951), 13 N. J. Super. 294, 80 A. 2d 337; Texas Indemnity Ins. Co. v. Dean, (Tex. Civ. App. 1934) 77 S. W. 2d 748. We think the employer and its insurance carrier have failed to meet that burden in this case.

The findings of the attorney-referee and the majority of the Commission that the appellant suffered no serious disability as a result of the accident, and that the appellant's loss of earning capacity resulting from his injury was only $6 per week are, in our opinion, arbitrary and

not supported by any substantial evidence, and the circuit court erred in affirming the findings and the award made by the Commission. We are accordingly of the opinion that the judgment of the circuit court should be reversed and a judgment entered here amending the findings and. the award made by the Commision so as to show the claimant's loss of earning capacity at $17.50 per week, and an award of compensation to the claimant for permanent partial disability at the rate of 66-2/3 percent of that amount, or $11.67 per week, beginning December 1, 1952, and continuing throughout the period of his permanent partial disability, but not to exceed 450 weeks or $8,600, whichever is the lesser amount.

The judgment of the circuit court is therefore reversed, and judgment will be entered here amending the findings and the order of the Commission in the manner stated above, so as to show an award of compensation of $11.67 per week, instead of $4 per week; and the order of the Commission as thus amended, will be affirmed and the cause remanded to the Commission for the enforcement of the award.

Reversed and judgment rendered in favor of the appellant, and cause remanded.

*McGehee, C. J.,* and *Lee, Holmes* and *Arrington, JJ.,* concur.